J-A07012-17
J-A07013-17

2018 PA Super 103

JENNIFER M. STRAW AND THOMAS P.
STRAW, INDIVIDUALLY AND AS CO-
ADMINISTRATORS OF THE ESTATE OF
ELIJAH C. STRAW, DECEASED; AND
ROWAN J. STRAW, A MINOR, BY AND
THROUGH HIS PARENTS AND NATURAL
GUARDIANS, JENNIFER M. STRAW AND
THOMAS P. STRAW

v.

KIRK A. FAIR AND GOLON MASONRY
RESTORATION, INC.

v.

PITTSBURGH LUBES, INC. D/B/A JIFFY
LUBE, TOWER AUTO SALES & SERVICE,
NATIONAL AUTOMOTIVE PARTS
ASSOCIATION-NAPA AUTO PARTS
T/D/B/A/ NAPA

v.

THOMAS P. STRAW

APPEAL OF:  GOLON MASONRY
RESTORATION, INC.

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 742 WDA 2016

Appeal from the Judgment Entered April 28, 2016
In the Court of Common Pleas of Allegheny County
Civil Division at No(s):  G.D. NO. 2013-003294

JENNIFER M. STRAW AND THOMAS P.
STRAW, INDIVIDUALLY AND AS CO-
ADMINISTRATORS OF THE ESTATE OF
ELIJAH C. STRAW, DECEASED; AND
ROWAN J. STRAW, A MINOR, BY AND
THROUGH HIS PARENTS AND NATURAL

IN THE SUPERIOR COURT OF
PENNSYLVANIA

J-A07012-17
J-A07013-17

GUARDIANS, JENNIFER M. STRAW AND
THOMAS P. STRAW

v.

KIRK A. FAIR AND GOLON MASONRY
RESTORATION, INC.

v.

PITTSBURGH LUBES, INC. D/B/A JIFFY
LUBE, TOWER AUTO SALES & SERVICE,
NATIONAL AUTOMOTIVE PARTS
ASSOCIATION-NAPA AUTO PARTS
T/D/B/A/ NAPA

v.

THOMAS P. STRAW

APPEAL OF:  KIRK A. FAIR

No. 743 WDA 2016

Appeal from the Judgment Entered April 28, 2016
In the Court of Common Pleas of Allegheny County
Civil Division at No(s):  G.D. NO. 13-003294

BEFORE:  OLSON, STABILE and STRASSBURGER,* JJ.

OPINION BY OLSON, J.:                    FILED APRIL 30, 2018

Appellants, Kirk A. Fair and Golon Masonry Restoration, Inc. (hereinafter "Golon Masonry"), appeal from the judgment entered on April 28, 2016, in favor of Jennifer M. Straw and Thomas P. Straw, individually and as co-administrators of the Estate of Elijah C. Straw, a deceased minor, and Rowan J. Straw, a minor, by and through his parents and natural

_____
* Retired Senior Judge assigned to the Superior Court.

- 2 -

guardians, Jennifer M. Straw and Thomas P. Straw (hereinafter, collectively, "Plaintiffs"), and against Appellants, in the amount of $35,114,122.78. After careful review of this tragic case, we are constrained to vacate the judgment and remand.

I. Facts and Procedural History

On February 21, 2013, Plaintiffs filed a complaint against Appellants. The complaint sounded in negligence and, within the complaint, Plaintiffs averred the following.

At approximately 7:30 p.m. on May 1, 2012, Thomas Straw was driving his Pontiac Vibe automobile north on State Route 28 (hereinafter "Route 28"), in Allegheny County, Pennsylvania, near the RIDC Drive exit. Plaintiffs' Complaint, 2/21/13, at ¶ 9. Jennifer Straw (Mr. Straw's wife) and the Straws' two young sons, Elijah and Rowan, were passengers in the car. Id. at ¶ 16. As the Straws were driving down the highway, their "vehicle experienced a mechanical malfunction that caused Thomas Straw to reduce his speed and . . . bring the vehicle to a controlled stop" in the middle lane of the highway; Mr. Straw then turned on his hazard flashers. Id. at ¶¶ 11 and 14.

At around the same time, Kirk Fair was driving behind the Straws, in a 2010 Ford F-250 truck that his employer, Golon Masonry, provided him to use in his job. Id. at ¶¶ 6-7 and 10. Plaintiffs averred:

> At the time Thomas Straw was bringing his vehicle to a controlled stop, [Mr.] Fair . . . observed folders and binders that had been sitting on the front seat of the Ford truck

slide onto the floor of the truck. Upon observing the aforementioned items slide to the floor, [Mr.] Fair reached for the items and "straightened" them up. As [Mr.] Fair was "straightening" the items, he was looking down at the floor of the vehicle, not at the highway in front of him. After "straightening" the items, [Mr.] Fair looked up and observed the Straw vehicle stopped in front of him with its hazard flashers blinking.

Id. at ¶¶ 12-13.

Mr. Fair did not stop his truck in time and he crashed into the Straws' stationary vehicle while traveling at a speed in excess of 60 miles per hour. Id. at ¶¶ 14-15. The collision caused serious injuries to Thomas, Jennifer, and Rowan Straw; horribly, the Straws' six-year-old son, Elijah, died from the injuries he received in the accident.[1] Id. at ¶¶ 16-19.

Plaintiffs' ten-count complaint sought compensatory and punitive damages against Appellants. As Plaintiffs claimed: at the time of the accident, Mr. Fair was recklessly driving under the influence of narcotics; even if Mr. Fair were not under the influence of narcotics, Mr. Fair's conduct was negligent and reckless; Golon Masonry was vicariously liable for Mr. Fair's conduct; and, Golon Masonry was independently negligent for improperly hiring, training, and supervising Mr. Fair. Id. at ¶¶ 30-86.

_____

[1] As will be explained below, Mr. Fair later pleaded guilty to multiple crimes arising out of the May 1, 2012 accident. On February 18, 2014, the trial court sentenced Mr. Fair to serve an aggregate term of six to 23 months in jail, followed by ten years of probation, for his convictions. N.T. Guilty Plea and Sentencing Hearing, 2/18/14, at 1-14.

On May 22, 2013, Appellants filed an answer, new matter, and cross-claim. Amongst other things: the answer admitted that, "at the time of the [] accident[, Mr. Fair] was an employee of [Golon Masonry], and Mr. Fair was acting in the course and scope of his employment;" the new matter alleged that Thomas Straw was comparatively negligent for his injuries; and, the cross-claim, which Appellants asserted against Thomas Straw, alleged that Mr. Straw was negligent in causing the accident and was, therefore, directly liable to Jennifer Straw, Rowan Straw, and the Estate of Elijah Straw, or liable over to Appellants for contribution or indemnity. Appellants' Answer, New Matter, and Cross-Claim, 5/22/13, at ¶¶ 6 and 88 and Cross-Claim ¶¶ 1-4. Specifically, Appellants alleged in the cross-claim that Mr. Straw stopped his vehicle on Route 28 because the hood of his vehicle popped open while he was driving, thus obstructing his vision. Further, Appellants alleged, the hood opened because the hood latch failed. According to Appellants, Mr. Straw was negligent because he knew that "the hood and/or latching mechanism on the vehicle was not in good operating condition" and, yet, "continu[ed] to travel and/or remain on the highway [] when it was hazardous and unsafe to do so." Id. at Cross-Claim ¶ 2. In addition, Appellants claimed, Mr. Straw was negligent in failing to remove his vehicle from the highway and in "allow[ing the vehicle] to remain in the lane of travel when it was unsafe and hazardous to do so." Id.

Appellants also filed complaints to join three additional defendants: Pittsburgh Lubes, Inc. d/b/a Jiffy Lube (hereinafter "Jiffy Lube"); Tower Auto

Sales and Service (hereinafter "Tower Auto"); and, National Automotive Parts Association – NAPA Auto Parts (hereinafter "NAPA Auto Parts")[2] (hereinafter, collectively, "Additional Defendants"). Within their complaints to join, Appellants repeated their allegation that, immediately before the accident, the hood latch failed on the Straws' vehicle. Appellants claimed that, when the hood latch failed, the vehicle's hood flew open and obstructed Mr. Straw's vision of the road, thus "result[ing] in him bringing his vehicle to a complete stop in the middle of Route 28," which caused the accident. According to the complaints to join, the Additional Defendants negligently performed work on the hood latch of the Straws' vehicle or analyzed the vehicle and assured the Straws that the hood latch was safe; therefore, Appellants claimed that the Additional Defendants were all directly liable to the Plaintiffs or liable over to Appellants for contribution and indemnity. See Complaint to Join Additional Defendant Jiffy Lube, 6/26/13, at 1-7; Complaint to Join Additional Defendants Tower Auto and NAPA Auto Parts, 9/11/13, at 1-10.

_____

[2] Appellants incorrectly identified Fayette Parts Services, Inc. as "NAPA Auto Parts" and, on January 22, 2014, the parties stipulated that the name NAPA Auto Parts "shall be removed from the caption of the lawsuit in lieu of the correct Additional Defendant Fayette Parts Services, Inc." Stipulation, 1/22/14, at 1. Nevertheless, the caption still employs the name "NAPA Auto Parts" to refer to "Fayette Parts Services, Inc."; therefore, this Court will refer to the party as "NAPA Auto Parts."

At the close of discovery, the Additional Defendants and Plaintiffs filed motions for summary judgment. We summarize these motions below.

I.A. Tower Auto's Motion for Summary Judgment

According to Tower Auto's summary judgment motion, on September 27, 2011, Thomas Straw took his Pontiac Vibe automobile to Tower Auto for its required annual state inspection. Tower Auto's Brief in Support of Motion for Summary Judgment, 8/10/15, at 6. "In the course of the state inspection, Tower's owner, [John] Fanto, noticed after he pulled the handle inside the vehicle to release the hood latch that the primary hood latch had not sprung back into place. . . . The secondary latch, which catches the hood when the primary latch is released, functioned properly at all times during the inspection, and did not require any service." Id. at 6-7. According to Tower Auto, "[Mr. Fanto] serviced the primary hood latch by spraying it with a lubricant, which flushed the debris from the latch, and mov[ed] it back and forth with a screwdriver, so that the primary latch functioned normally and moved freely again." Id. at 7. Mr. Fanto then closed the hood completely, issued Mr. Straw a certificate of inspection, and the Straws did not bring the vehicle back to Tower Auto at any point after the September 2011 state inspection. Id. at 7-9.

Tower Auto claimed that it was entitled to summary judgment because "there was no evidence that [it] breached any duty owed to the Plaintiffs" and, relatedly, because, under the Pennsylvania Motor Vehicle Code, it was entitled to "limited immunity from suit [for work done during]

the required state inspection." Id. at 11-13; Tower Auto's Motion for Summary Judgment, 8/10/15, at ¶ 2; see also 75 Pa.C.S.A. § 4702.1.

I.B. Jiffy Lube's Motion for Summary Judgment

Jiffy Lube's summary judgment motion declared:

> In January 2012, [] Thomas Straw brought Plaintiffs' car to Jiffy Lube for an oil change. Approximately one week after the January 2012 oil change, Plaintiffs began noticing that the hood latch was not closing completely. Plaintiffs allege that shortly thereafter, still in January of 2012, they went back to the same Jiffy Lube location and advised an employee of the hood not closing properly. Plaintiff[s] further allege that an employee of Jiffy Lube, free of charge, performed some sort of work on the hood and got it to close properly. Subsequent to the alleged second visit to Jiffy Lube in January [] 2012, Plaintiffs drove their car to Ohio on a family trip and experienced no problem with the hood.
>
> On March 16, 2012, Plaintiffs took their car to Additional Defendant, NAPA Auto Parts. . . . While at NAPA [Auto Parts,] Plaintiffs allege that they had the hood latch inspected once again and asked if it should be fixed or was safe to drive since they had an inspection upcoming and they intended to take another family trip to Ohio. Plaintiffs state that they were advised by NAPA [Auto Parts] that the hood latch was working properly and was safe to drive. Plaintiffs traveled to Ohio after the March 2012 visit to NAPA [Auto Parts] and drove hundreds of miles with no problems with the hood or hood latch until the accident on May 1, 2012.

Jiffy Lube's Motion for Summary Judgment, 6/29/15, at ¶¶ 12-18 (internal paragraphing omitted).

Jiffy Lube claimed that, under these facts: it owed no duty of care to the Plaintiffs because it is not "in the business of fixing hoods or hood latches of cars, particularly free of charge;" even if it owed Plaintiffs a duty

of care, its negligence was not the proximate cause of the accident or resulting injuries; Mr. Fair's criminal conduct constituted a superseding cause of Plaintiffs' injuries, thus relieving Jiffy Lube of liability; the Straws' "continued operation of the vehicle long after it was last at Jiffy Lube and with actual knowledge that the hood was still not closing properly" constituted a superseding cause of Plaintiffs' injuries, thus relieving Jiffy Lube of liability; "[t]he examination of the hood latch at NAPA [Auto Parts], two months after it was last seen at Jiffy Lube, and the NAPA [Auto Parts'] manager's assurances that it was 'absolutely' safe to drive in its condition" constituted a superseding cause of Plaintiffs' injuries, thus relieving Jiffy Lube of liability; Appellants "have no right of contribution and/or indemnification [] since Jiffy Lube and [Appellants] are not joint tortfeasors;" and, Appellants "are not entitled to contribution and/or indemnity from Jiffy Lube" because Appellants' "conduct was reckless while, at best, Jiffy Lube's conduct is alleged to be negligent." Id. at ¶¶ 20-24; Jiffy Lube's Brief in Support of Motion for Summary Judgment, 6/29/15, at 4-13.

I.C. NAPA Auto Parts' Motion for Summary Judgment

Within NAPA Auto Parts' motion for summary judgment, NAPA Auto Parts claimed that it "is not an automotive repair facility and does not perform repairs on automobiles for the public." NAPA Auto Parts' Motion for Summary Judgment, 6/26/15, at ¶ 8. According to NAPA Auto Parts, Appellants' cross-claim against it is based upon the allegation that, on March 16, 2012, Thomas Straw visited a particular NAPA Auto Parts store and

purchased a tail light bulb for his car. NAPA Auto Parts claimed that, during his visit, Mr. Straw "asked the cashier whether he would mind looking at the latch as Mr. and Mrs. Straw were intending to travel to Ohio." Id. at ¶ 9. The cashier then "looked at the vehicle and indicated that the vehicle should be able to be taken to Ohio, but that Mr. and Mrs. Straw should have the latch fixed." Id. at ¶ 10. According to NAPA Auto Parts, the Straws drove the vehicle "for approximately six [] weeks and [] for between 500 to 600 miles prior to the accident with no incidents." Id. at ¶¶ 11-13.

According to NAPA Auto Parts, under this characterization of the facts, it could not be held negligent because: it did not owe any duty of care to any party; it did not breach any duty of care owed to any party; and, there was no evidence that the latch was defective on March 16, 2012. Id. at ¶¶ 14-15. Further, NAPA Auto Parts claimed that it could not be a joint tortfeasor with Appellants, as "[t]he conduct of [Appellants] was reckless and the conduct of [NAPA Auto Parts] was [only] allegedly negligent." Id. at ¶ 17; see also NAPA Auto Parts' Brief in Support of Motion for Summary Judgment, 6/26/15, at 4.

### I.D. Plaintiffs' Motion for Summary Judgment

Finally, Plaintiffs filed a motion for summary judgment, where they requested that the trial court "dismiss the crossclaim [that Appellants] filed against Plaintiff Thomas Straw." Plaintiffs' Motion for Summary Judgment, 6/19/15, at "Wherefore" Clause (some internal capitalization omitted). In support of their motion, Plaintiffs attached a transcript from Mr. Fair's

February 18, 2014 guilty plea and sentencing hearing, where Mr. Fair pleaded guilty to the following crimes arising out of the May 1, 2012 accident: four counts of recklessly endangering another person (hereinafter "REAP") (18 Pa.C.S.A. § 2705); three counts of aggravated assault by vehicle (75 Pa.C.S.A. § 3732.1(a)); one count of homicide by vehicle (75 Pa.C.S.A. § 3732(a)); and, one count each of exceeding the 55-miles-per-hour speed limit (by 16 miles per hour) (75 Pa.C.S.A. § 3362(a)(2)) and driving vehicle at safe speed (75 Pa.C.S.A. § 3361).

During the guilty plea colloquy, the Commonwealth recited the factual basis for Mr. Fair's plea:

> Had the Commonwealth proceeded to trial on this case . . . , the evidence would have shown that on May 1st of 2012 at approximately 7:30 p.m., Thomas Straw was driving on [] Route 28 North, in a blue 2004 Pontiac Vibe. . . . The Vibe's hood latch malfunctioned causing the Vibe's hood to be released upwards. Mr. Straw could not see the road due to this obstruction. He brought the vehicle to a stop in the center lane of Route 28 northbound, just prior to Exit 10 and activated his hazard lights.
>
> Thomas Straw would testify that as he brought the vehicle to a stop, he looked in his rear view mirror and there were no cars approaching. His wife, Jennifer Straw, was seated in the front seat. His son, Rowan Straw was seated in the back seat on the left side and his son Elijah Straw was seated in the back seat on the right side.
>
> The defendant Kirk Fair was driving North on [Route] 28 in a white F250 Ford truck. . . . At an impact point just prior to Exit 10 on northbound [] Route 28, Kirk Fair crashed into the rear of the Pontiac Vibe while traveling at a speed between 54 and 64 miles per hour as indicated by the Ford truck's Powertrain Control Module. The impact of the crash resulted in the Pontiac Vibe being totaled. The crash also

- 11 -

caused severe injuries to Thomas, Jennifer and Rowan Straw, and caused the death of rear seated passenger Elijah Straw who was six years old at the time.

Data obtained from the download of Fair's Ford truck indicated that Fair was driving at approximately 71 miles per hour for 19 seconds prior to impact. Fair did not apply the brakes until .6 seconds prior to the impact with the Pontiac Vibe. The speed limit for this stretch of roadway is 55 miles per hour. The defendant did admit to taking his eyes off the road while driving. He stated that when he looked up he noticed the blue Pontiac Vibe with its flashing lights on, but due to the weight of the truck he could not control the truck and avoid the collision. The truck that Fair was driving was weighted down with materials that he had just loaded for work.

Based on a traffic crash reconstruction conducted by Corporal Gregory Brandt of the Pennsylvania State Police, who is an expert in the field of accident construction, Fair would have been able to see the victim's vehicle approximately 2,058 feet prior to the impact if Fair was looking at the road. At a constant speed of 71 miles per hour, it would have taken Fair approximately 19 seconds for the Ford truck to travel that 2,058 feet and reach the rear end of the Vibe. At that speed, the defendant would have needed approximately between 6 to 7 seconds to perceive the victim's vehicle, apply the brakes, and stop safely before striking the vehicle. Therefore, Fair could have safely stopped his truck prior to striking the vehicle if he had observed the vehicle within the first 12 to 13 seconds of possible perception. The result of his inattentiveness, driving reckless and gross[] negligen[ce] caused his vehicle to crash into the rear end of the Pontiac Vibe at a high rate of speed resulting in serious injuries for all four passengers and caus[ing] the death of Elijah Straw.

N.T. Guilty Plea and Sentencing Hearing, 2/18/14, at 6-9.

At the conclusion of the factual recitation, Mr. Fair's attorney declared that he did not have "any additions or corrections" to the recitation. Id. at 9. Mr. Fair then pleaded guilty to the above-mentioned crimes, the trial

court accepted Mr. Fair's plea, and the court sentenced Mr. Fair to serve an aggregate term of six to 23 months in jail, followed by ten years of probation. Id. at 9 and 12-13.

Within Plaintiffs' summary judgment motion, Plaintiffs noted that Mr. Fair pleaded guilty to four counts of REAP, which requires a mens rea of "recklessness." Plaintiffs argued that Mr. Fair's REAP convictions constitute conclusive proof, in this civil proceeding, that Mr. Fair acted recklessly in causing the May 1, 2012 accident and, thus, in causing all harm against Plaintiffs. Plaintiffs' Motion for Summary Judgment, 6/19/15, at ¶ 15. Confusing Appellants' cross-claim against Mr. Straw with Appellants' affirmative defense pleaded in new matter that Mr. Straw was comparatively negligent for his own injuries,[3] Plaintiffs claimed that, since Appellants did not allege reckless behavior on the part of Mr. Straw, Appellants' cross-claim against Mr. Straw must be dismissed. Specifically, Plaintiffs argued:

> a plaintiff's contributory negligence cannot serve as a viable defense if the defendant is found to have acted in reckless disregard of the plaintiff's safety. . . . Accordingly where, as here, [Mr.] Fair's acts were reckless, while Mr. Straw's acts have been alleged to be only ordinary negligence, comparative negligence principles are simply inapplicable under Pennsylvania law. . . . In light of [this, Appellants] cannot prove the elements of their crossclaim against Plaintiff Thomas Straw and as such Plaintiffs respectfully request that [the trial court] grant Plaintiffs' motion for summary judgment and dismiss the crossclaim.

_____

[3] See infra at **62-69.

Id. at ¶¶ 15-17 (some internal capitalization omitted).

I.E. Appellants' Responses to the Summary Judgment Motions

Appellants responded to the motions and argued that none of the movants were entitled to summary judgment. Moreover, Appellants attached deposition transcripts and documents to their responses that, they argued, established genuine issues of material fact that precluded the entry of summary judgment. These transcripts and documents included: the deposition transcripts of Thomas Straw, Jennifer Straw, John Robert Fanto, and Pennsylvania State Police Corporal Gregory Brant; answers to interrogatories; a Pennsylvania State Police Crash Report Narrative; a Pennsylvania State Police General Investigation Report; and, an expert report authored by Edward M. Weber of Rimkus Consulting Group, Inc. Viewed in the light most favorable to Appellants as the non-moving parties, the attached transcripts and documents presented the following evidence in opposition to the summary judgment motions. See Washington v. Baxter, 719 A.2d 733, 737 (Pa. 1998) ("as with all summary judgment cases, we must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party").

The owner of Tower Auto, John Robert Fanto, testified that he performed the September 27, 2011 state inspection on the Straws' Pontiac

Vibe automobile.  Deposition of John Robert Fanto, 6/29/15, at 11-12.[4]  Mr. Fanto testified:

> Immediately upon popping the hood . . . [I] determine[d] that there was a hood latch assembly issue. . . .  I didn't know what the problem was at that point, but when I reached down and I pulled the lever to open the hood, the little plastic lever did not return.  That throws up, to me, a red flag. . . .  At that point, I carried on with the rest of [the] inspection, finished all that, and as I was closing his hood, that's when I serviced that hood latch.

Id. at 19 and 20-21.

Mr. Fanto testified that he serviced the hood latch by "hos[ing] it down with a penetrating oil and work[ing] the latch back and forth."  Id. at 21.  Specifically, Mr. Fanto testified, he hosed the latch down with a penetrating oil that was manufactured by a company called Zep; Mr. Fanto then used a screwdriver to "work the latch back and forth just to get it moving and operating correctly."  Id. at 22 and 26.  Mr. Fanto testified that, after he did this, he was able to successfully close the hood.  Id. at 26.  Mr. Fanto then issued Mr. Straw a certificate of inspection for the vehicle and wrote, in the service invoice, that he was charging Mr. Straw $21.00 for:  "repair hood latch assembly, hood would not close, cable would not return."  Tower Auto Service Invoice, 9/27/11, at 1.[5]  As Mr. Straw testified, it was at this time

_____

[4] Appellants attached Mr. Fanto's deposition transcript as "Exhibit G" to their response in opposition to Tower Auto's summary judgment motion.

[5] Appellants attached the September 27, 2011 Tower Auto Service Invoice as "Exhibit F" to all responses in opposition to summary judgment.
(Footnote Continued Next Page)

that he first became aware that there was "an issue with the hood." Deposition of Thomas Straw, 5/13/15, at 29.[6]

Mr. Straw testified that he next observed a problem with the Pontiac Vibe's hood in January 2012, following an oil change at Jiffy Lube. According to Mr. Straw, after the oil change, he returned to the Jiffy Lube and told the employees "I got an oil change here, and the next thing I know my hood doesn't close all the way." Id. at 33. Mr. Straw testified that a Jiffy Lube employee "just kind of grunted and went and got some tools, you know, worked with it for a little bit, grunted some more, went and got some other tools, worked with it, got it down and that was that." Id. Upon completion, Mr. Straw asked the Jiffy Lube employee, "is [this] safe to drive? It's not going to pop up on me?" Id. at 34 and 71. The employee responded by telling Mr. Straw that the vehicle was indeed safe to drive. Id.

The third time Mr. Straw addressed the problem with the Pontiac Vibe's hood was in March 2012, when he and his family were driving to Ohio. In particular, Mr. Straw testified that he stopped his vehicle at a NAPA Auto Parts store to purchase a tail light bulb for the vehicle. Id. at 35. While there, Mr. Straw asked an employee to "take a look at [the hood] and . . . let me know if it's all right, if it's safe." Id. at 36. Mr. Straw testified: "I

(Footnote Continued) ─────────────────

[6] Appellants attached Mr. Straw's deposition transcript as "Exhibit B" to all responses in opposition to summary judgment.

said I have a state inspection coming up in a couple months, is this going to make it to the state inspection, is it safe[?] He said absolutely. He said it's metal on metal. They don't call it a safety latch for nothing." Id. at 36.

Mr. Straw testified that he could not remember whether the NAPA Auto Parts' employee did "anything physically with the car," but Mr. Straw testified that he relied upon the employee's assurances that the hood was safe. Id. at 36-37. Mr. Straw also testified that he did not "recall opening [the hood] up between the time [he] left NAPA [Auto Parts] and the [May 1, 2012] accident." Id. at 39.

Regarding the accident, Mr. Straw testified that the accident occurred at around 7:00 p.m. on May 1, 2012 and that, at the time of the accident, he was driving his Pontiac Vibe automobile with Jennifer, Elijah, and Rowan Straw as his passengers. Id. at 40 and 44. Mr. Straw testified that he was driving down the middle lane of Route 28, in daylight, with a clear sky, in light traffic, and in an area that had a 55-mile-per-hour speed limit. Id. at 40-41. As recounted in the Pennsylvania State Police Crash Report Supplemental Narrative:[7]

_____

[7] Appellants attached the Pennsylvania State Police Crash Report Supplemental Narrative as Exhibits "E" and "G" to their responses in opposition to the motions for summary judgment filed by Jiffy Lube, NAPA Auto Parts, and Plaintiffs; Appellants attached the Pennsylvania State Police Crash Report Supplemental Narrative as Exhibits "E" and "I" to their response in opposition to the motion for summary judgment filed by Tower Auto.

> [Mr. Straw] said he was driving north and for a second or so before the hood popped he could hear some kind of noise under the hood. Then he said the hood popped and the hood blocked his view through the front so he [could not] see. He said his immediate priority was to bring the vehicle to a stop. He said he used his rearview and side mirrors to bring the vehicle to a complete stop.
>
> . . . He said that he activated his hazard lights once he was stopped. He said he also recalled his wife placing her hand on his lap and saying everything is going to be [OK]. He said he looked in the rearview mirror and the first thing he saw was the truck on the horizon line. He said for a brief second he thought to himself [it's] a good thing he is back far enough to react. He said it seemed like an eternity at the time but it was probably something like 5 to 8 seconds minimum that the truck crashed into him. He said at no time was there any cars between him and the truck. In fact he said he didn't recall any traffic in the area around him, or even southbound really at the time of this crash.

Pennsylvania State Police Crash Report Supplemental Narrative, 4/24/13, at 1.

Pennsylvania State Police Corporal Gregory Brandt investigated the accident for the Pennsylvania State Police. Following the investigation, Corporal Brandt issued a General Investigation Report, where he concluded that "[a] mechanical problem with [the] hood latch [on the Straws' Pontiac Vibe automobile] resulted [in] its hood opening while [the vehicle] was traveling" on Route 28. Pennsylvania State Police General Investigation Report, 1/22/13, at 21.[8] Further, Corporal Brandt "concluded with [a] high

---

[8] Appellants attached the January 22, 2013 Pennsylvania State Police General Investigation Report as "Exhibit K" to their responses in opposition
(Footnote Continued Next Page)

level of certainty" that, prior to the accident, the hood latch on the Pontiac Vibe had been damaged "for a substantial amount of time." Id. at 17. Finally, Corporal Brandt wrote: "in a post-crash interview with investigators, [Thomas Straw] related that he was aware of the faulty hood latch and attempted to have the latch repaired one or two weeks prior." Id. at 21.

Appellants also relied upon an expert report authored by Edward M. Weber, of Rimkus Consulting Group, Inc. (hereinafter "the Weber Report"), to oppose Additional Defendants' motions for summary judgment.[9] The Weber Report declared:

> The 2004 Pontiac Vibe Owner's Manual states . . . that the hood latch should be lubricated with multi-purpose lubricant, GM part no 12346241, yearly.
>
> It is extremely rare that hood latches fail to lock. The most vulnerable areas are the latch release lever (on latch itself) and hood release cable. When the hood latch is not lubricated at regular intervals, the original grease becomes hard and dries out. It also becomes gritty with the accumulation of dirt, which causes the lever and latch to stick and bind. To properly repair the latch, a de-greasing solvent should be used to remove all of the old grease and dirt. The debris in the latch should be blown out using

(Footnote Continued) ——————————

to the motions for summary judgment filed by Plaintiffs and NAPA Auto Parts and as "Exhibit J" to their response in opposition to the motion for summary judgment filed by Jiffy Lube.

[9] Appellants attached the Weber Report as "Exhibit I" to their responses in opposition to the motions for summary judgment filed by Jiffy Lube and NAPA Auto Parts and as "Exhibit H" to their response in opposition to the motion for summary judgment filed by Tower Auto.

compressed air. Penetrating oil does not last and is not the proper lubricant for this application.

When Mr. Fanto of Tower Auto sprayed the penetrating oil on the Pontiac's hood latch, it was just a temporary fix. The penetrating oil eventually dried out, which reverted the latch back to its malfunctioning condition. After removing the old grease with the proper solvent, lithium, or white, grease should have been liberally applied. The thicker grease serves two purposes: it keeps the latch lubricated and prevents dirt and dust from entering the mechanism.

The secondary hood latch should have been degreased and lubricated in the same manner. Because its return spring was ineffective, vibrations and movement of the hood allowed it to move away from the secondary striker plate, causing the hood to disengage from the secondary latch, which allowed the hood to swing open.

There was not enough information to determine Jiffy Lube's culpability other than it appears that the mechanic just manually moved the release lever back so the hood would latch. He should have advised Mr. Straw to have the hood latch repaired.

[The NAPA Auto Parts] manager[] incorrectly advised Mr. Straw that the Pontiac was safe to drive. Although he did correctly advise Mr. Straw to have the vehicle fixed, he should have advised Mr. Straw to have the hood latch repaired as soon as possible.

Weber Report, 8/11/15, at 4.

### I.F. Trial Court's Summary Judgment Rulings, the Trial, and the Current Appeal

On August 31, 2015, the trial court heard oral argument on the summary judgment motions and, on November 10, 2015, the trial court granted all four motions. As the trial court later explained, it granted Plaintiffs' motion for summary judgment because, first, it concluded that Mr.

Straw's conduct was not a proximate cause of the harm. Trial Court Opinion, 9/8/16, at 5 n.3. Second, the trial court reasoned that Mr. Fair pleaded guilty to REAP and Mr. Fair was, therefore, bound by his admission that he acted recklessly in causing the accident. According to the trial court, "[f]lowing from [the guilty plea] and the law that contributory negligence cannot be weighed or applied to reckless conduct, the claims of contributory negligence against Mr. Straw were improper and irrelevant to any contested issue. As such, the [trial] court granted summary judgment on this issue."[10] Trial Court Opinion, 9/8/16, at 4-5. With respect to the summary judgment motions filed by Tower Auto, Jiffy Lube, and NAPA Auto Parts, the trial court declared that it granted the motions because: 1) the Additional Defendants did not owe a duty to the Plaintiffs, and 2) "the conduct of [Appellants] was not reasonably foreseeable . . . [and, therefore,] proximate cause could not be established against the Additional Defendants." Id. at 7-9. The trial court thus dismissed the cross-claim Appellants filed against Mr. Straw and the complaints to join that Appellants filed against Additional Defendants.

_____

[10] On September 9, 2015, Appellants filed a motion for leave to file an amended answer, new matter, and counterclaim, so that they could claim that Thomas Straw acted recklessly at the time of the accident. Appellants' Motion for Leave to Amend, 9/9/15, at ¶¶ 1-17. According to Golon Masonry, when the trial court granted Mr. Straw's summary judgment motion, "[t]he motion to amend filed by Golon [Masonry] and Mr. Fair was thereby mooted." Appellant Golon Masonry's Brief at 8.

The case was called for trial and, on December 7, 2015, the trial court issued a number of pre-trial rulings, including a ruling bifurcating the trial into compensatory and punitive damages phases. With respect to the compensatory damages phase of the trial, on December 15, 2015, after six days of trial, the jury found in favor of Plaintiffs and against Appellants in an aggregate amount of $32,000,000.00. N.T. Trial, 12/15/15, at 1175-1180.

Following the jury's compensatory damages award, Plaintiffs withdrew their punitive damages claim without prejudice to their right to reassert the claim if the case were to be remanded after an appeal. Id. at 1201-1202. The trial court denied Appellants' timely post-trial motions and, on April 28, 2016, the prothonotary entered judgment in favor of Plaintiffs and against Appellants in the amount of $35,114,122.78. Appellants filed timely notices of appeal and now raise the following claims to this Court:

> I. Did the trial court err in granting summary judgment to Additional Defendants Tower [Auto], Jiffy Lube, and NAPA [Auto Parts], and Plaintiff/Cross-Claim Defendant Thomas Straw?
>
>> A. Did the trial court err in granting summary judgment to Tower [Auto] where there was ample evidence from which the jury could have found that Tower [Auto] was both negligent and reckless?
>>
>> B. Did the trial court err in granting summary judgment to Jiffy Lube where there was ample evidence from which the jury could have found that Jiffy Lube was both negligent and reckless?
>>
>> C. Did the trial court err in granting summary judgment to NAPA [Auto Parts] where there was ample evidence

from which the jury could have found that NAPA [Auto Parts] was both negligent and reckless?

D. Did the trial court err in granting summary judgment to Thomas Straw where there was ample evidence from which the jury could have found that Thomas Straw was both negligent and reckless?

Appellant Kirk Fair's Brief at 5; see also Appellant Golon Masonry's Brief at 5.

In this appeal, Appellants also raise claims regarding the trial court's pre-trial, trial, and post-trial rulings. As Appellants' claims on these rulings differ somewhat from one another, we will independently quote the parties' claims. Mr. Fair claims:

II. Did the trial court err in refusing to award a new trial based on numerous improper and unfairly prejudicial rulings at trial?

A. Did the trial court err in admitting irrelevant, inflammatory, and unfairly prejudicial evidence of prior convictions and pre-accident and post-accident drug use and treatment against Kirk Fair?

B. Did the trial court err in denying [Appellants'] motions for a mistrial and permitting [Plaintiffs'] counsel to make a number of improper and unfairly prejudicial statements in his closing argument, which individually and collectively inflamed the jury and tainted the verdict?

C. Did the trial court err in submitting a verdict sheet which shifted the burden to Appellants[] to disprove Decedent Elijah Straw's claim for conscious pain and suffering and improperly directed a verdict against Kirk Fair on the issue of recklessness?

D. Did the trial court err in precluding Kirk Fair from contesting that he had 19 seconds and 2058 feet of

distance in which to avoid the stopped Straw vehicle based on Kirk Fair's criminal plea?

E. Did the trial court err in refusing to grant judgment N.O.V., a new trial, or a substantial remittitur because the jury's verdict was shocking, manifestly excessive, and unsupported by the trial evidence?

Appellant Kirk Fair's Brief at 5.

Golon Masonry claims:

II. Did the trial court err in refusing to award a new trial based on numerous improper and prejudicial rulings at trial?

A. Did the trial court err in permitting [Plaintiffs] to pursue a negligent entrustment claim against Golon [Masonry] without the requisite expert testimony to explain the applicable standard of care?

B. Did the trial court err in admitting irrelevant, inflammatory, and highly prejudicial evidence regarding co-defendant Kirk Fair's drug problems?

C. Did the trial court err in permitting [Plaintiffs'] counsel to make a number of improper and highly prejudicial statements in his closing argument, which individually and collectively inflamed the jury and tainted the verdict?

D. Did the trial court err in shifting to [Appellants] the burden to disprove decedent Elijah Straw's claim for conscious pain and suffering?

E. Did the trial court err in submitting a jury verdict sheet that diluted [Plaintiffs'] burden of proof, directed a verdict against Golon [Masonry] with respect to causation on the direct claim against it, failed to apportion liability between Golon [Masonry] and co-defendant Kirk Fair on the direct claims against them, and contained numerous other reversible errors?

F. Did the trial court err in refusing to grant a new trial or a substantial remittitur based on the excessiveness of the verdict?

Appellant Golon Masonry's Brief at 5-6 (some internal capitalization omitted).

We conclude that the trial court erred when it granted summary judgment to Additional Defendants and to Thomas Straw. Therefore, we must vacate the judgment and remand. [11]

_____

[11] As noted, after the jury found Appellants liable and announced its compensatory damage award, Plaintiffs declared that they were withdrawing their punitive damages claim "without prejudice" to their right to assert the claim if the case were to be remanded following an appeal. See N.T. Trial, 12/15/15, at 1201-1202. Further, after Plaintiffs declared that they would withdraw the claim, counsel for Golon Masonry declared: "[w]e would agree to waive [the punitive damages claim] now and allow the [P]laintiffs to bring it back up if the case is remanded. That's fine." Id. The trial court then dismissed the jury. Id.

As this Court has held, even though Plaintiffs withdrew their punitive damages claim "without prejudice," the withdrawal of the claim means that "[t]here are no outstanding claims remaining" in this case. Levitt v. Patrick, 976 A.2d 581, 588 (Pa. Super. 2009). Moreover, the subsequent denial of Appellants' post-trial motions and entry of judgment upon the verdict give this Court jurisdiction to consider this appeal. As the Levitt Court explained:

> The key inquiry in any determination of finality is whether there is an outstanding claim. Pa.R.A.P. 341. . . . If any claim remains outstanding and has not been disposed of by the trial court, then it does not matter whether the claim is classified as a counterclaim or a bifurcated claim, for the result is the same: this Court lacks jurisdiction to entertain the appeal unless the appeal is interlocutory or we grant permission to appeal. Pa.R.A.P. 341.

(Footnote Continued Next Page)

## II. Analysis

## II.A. Standard of Review

(Footnote Continued) ———————————————

> Similarly, if a claim was discontinued prior to trial, we do not inquire whether the discontinuance was with or without prejudice. The Pennsylvania Rules of Civil Procedure permit a party to "commence a second action upon the same cause of action" after a discontinuance. Pa.R.C.P. 231. This second action is considered a new action and not a continuation of the initial action. Because a party may initiate a new action upon a discontinued claim, it follows that a discontinued claim is not before the trial court for resolution.
>
> Instantly, the parties jointly agreed to discontinue Patrick's sole bifurcated counterclaim against Levitt. The parties further agreed that all issues that were not the subject of the trial of this matter have been disposed of. The discontinuance constitutes a final judgment as a matter of law. Because our finality inquiry has always focused on the existence of an outstanding claim, we need not examine whether Patrick's bifurcated counterclaim was discontinued with or without prejudice. There are no outstanding claims remaining and thus we have jurisdiction to consider this matter.

Id. (some internal citations, quotations, and corrections omitted); see also Bourne v. Temple Univ. Hosp., 932 A.2d 114, 115-116 (Pa. Super. 2007) (the Bournes filed a medical malpractice complaint against Temple University Hospital, Gail O. Berman, M.D., and three other defendants. However, the Bournes failed to file a certificate of merit with their complaint and, thus, Temple University Hospital and Dr. Berman filed a praecipe for entry of a judgment of non pros. On February 6, 2006, the trial court denied the Bournes' petition to open the judgment of non pros and the Bournes appealed. As this Court held: "[o]n April 24, 2006, the trial court approved a stipulation withdrawing without prejudice the claims against [the three other defendants], thereby rendering the trial court's February 6, 2006 order final for purposes of appeal. See Pa.R.A.P. 341").

As this Court has stated:

> Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.
>
> Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

Englert v. Fazio Mech. Serv.'s, Inc., 932 A.2d 122, 124 (Pa. Super. 2007) (internal citations omitted); see also Summers v. Certainteed Corp., 997 A.2d 1152, 1159 (Pa. 2010) ("an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is de novo. This means we need not defer to the determinations made by the lower tribunals").

II.B. Analysis Regarding the Trial Court's Grant of Summary Judgment to Additional Defendants

We will first consider the trial court's grant of summary judgment to Additional Defendants.

As the trial court explained, it granted summary judgment to Additional Defendants because, it determined, Additional Defendants did not

- 27 -

owe Plaintiffs a duty and because "the conduct of [Appellants] was not reasonably foreseeable . . . [and, therefore,] proximate cause could not be established against the Additional Defendants." Trial Court Opinion, 9/8/16, at 7-9. Respectfully, we conclude that the trial court erred.

## II.B.1. Additional Defendants' Duties and Breaches of their Duties to Plaintiffs

Our Supreme Court has explained:

In Pennsylvania, the elements of a cause of action based on negligence are:

(1) a duty or obligation recognized by the law requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks;

(2) defendant's failure to conform to the standard required;

(3) a causal connection between the conduct and the resulting injury;

(4) actual loss or damage resulting to the plaintiff.

R.W. v. Manzek, 888 A.2d 740, 746 (Pa. 2005).

As to the element of duty, "[i]t is a fundamental principle of tort law [that] there cannot be a valid claim sounding in negligence unless there is a duty upon the defendant in favor of the plaintiff which has been breached." Alumni Ass'n v. Sullivan, 572 A.2d 1209, 1210-1211 (Pa. 1990). "The existence of a duty is a question of law for the court to decide." Manzek, 888 A.2d at 746; see also Restatement (Second) of Torts § 328B(a) and (b) ("[i]n an action for negligence the court determines . . . (a) whether the evidence as to the facts makes an issue upon which the jury may reasonably

find the existence or non-existence of such facts; (b) whether such facts give rise to any legal duty on the part of the defendant"). However, "[t]he determination of whether an act or failure to act constitutes negligence . . . in view of all the evidence has always been particularly committed to determination by a jury." Snead v. SPCA, 929 A.2d 1169, 1183 (Pa. Super. 2007) (internal quotations and citations omitted).

The Pennsylvania Supreme Court has held that Sections 323 and 324A of the Second Restatement of Torts correctly state the law of this Commonwealth. Section 323 provides:

> § 323 Negligent Performance of Undertaking to Render Services
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323; Feld v. Merriam, 485 A.2d 742, 746 (Pa. 1984) (recognizing that the Supreme Court has "adopted [Restatement (Second) of Torts § 323] as an accurate statement of the law in this Commonwealth").

Section 323 imposes liability "where a party assumes a duty, whether gratuitously or for consideration, and so negligently performs that duty that another suffers damage." Feld, 485 A.2d at 746. It applies:

> to any undertaking to render services to another which the defendant should recognize as necessary for the protection of the other's person or things. It applies whether the harm to another or his things results from the defendant's negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it.

Id., quoting Restatement (Second) of Torts § 323 cmt. a.

The rule stated in Section 324A "parallels the one stated in § 323, as to the liability of the actor to the one to whom he has undertaken to render services. [Section 324A, however,] deals with the liability to third persons." Restatement (Second) of Torts § 324A cmt. a. Section 324A declares:

> § 324A Liability to Third Person for Negligent Performance of Undertaking
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A; Cantwell v. Allegheny County, 483 A.2d 1350, 1353 (Pa. 1984) (recognizing that "the essential provisions of [Restatement (Second) of Torts § 324A] have been the law in Pennsylvania for many years").

As the comments to the rule state:

> [Section 324A] applies to any undertaking to render services to another, where the actor's negligent conduct in the manner of performance of his undertaking, or his failure to exercise reasonable care to complete it, or to protect the third person when he discontinues it, results in physical harm to the third person or his things. It applies both to undertakings for consideration, and to those which are gratuitous.

Restatement (Second) of Torts § 324A cmt. b.

Here, Appellants put forth evidence establishing a genuine issue of material fact that Additional Defendants owed Plaintiffs duties under Sections 323 and 324A of the Second Restatement – and that they breached those duties.[12]

_____

[12] In Althaus ex rel. Althaus v. Cohen, 756 A.2d 1166 (Pa. 2000), our Supreme Court held that the issue of duty is "necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society." Id. at 1169. The Althaus Court held that, to determine whether a duty exists in a particular case, a court must weigh "several discrete factors," including:

> (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

(Footnote Continued Next Page)

- 31 -

II.B.1.a. Tower Auto's Duties and Breaches of Its Duties to Plaintiffs

First, with respect to Tower Auto, Appellants put forth evidence that, viewed in the light most favorable to Appellants, tends to show the following.

On September 27, 2011, Thomas Straw took his vehicle to Tower Auto for a state inspection. During the inspection, the owner of Tower Auto, John Fanto, noticed a problem with the hood latch assembly. Mr. Fanto then undertook to repair the hood latch assembly by "hos[ing] it down with a penetrating oil and work[ing] the latch back and forth." Deposition of John

(Footnote Continued) ————————————

Id.

However, as our Supreme Court later made clear, the weighing of the Althaus factors is "more relevant to the creation of new duties than to the vindication of existing ones." Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co., 106 A.3d 27, 40 (Pa. 2014). Thus, the Supreme Court held:

> It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario. Common-law duties stated in general terms are framed in such fashion for the very reason that they have broad-scale application.

Id. at 40-41; see also Scampone v. Highland Park Care Ctr., LLC, 57 A.3d 582, 586 (Pa. 2012) (holding that "reliance on the principle articulated in Section 323 of the Restatement [(Second) of Torts] offered the functional equivalent of an Althaus factor analysis").

Here, we need not engage in an Althaus factor analysis because the instant case concerns a straightforward application of Sections 323 and 324A of the Second Restatement and the longstanding law of this Commonwealth.

Robert Fanto, 6/29/15, at 21. Mr. Fanto issued Mr. Straw a state inspection for the vehicle, billed Mr. Straw $21.00 for his work on the hood latch assembly, and noted, on the service invoice, that he had "repair[ed the] hood latch assembly." Id. at 21-26; Tower Auto Service Invoice, 9/27/11, at 1.

However, as stated in the Weber Report, Mr. Fanto should not have used penetrating oil to lubricate the hood latch because "[p]enetrating oil does not last . . . [and will] eventually dr[y] out." Weber Report, 8/11/15, at 4. Instead, the Weber Report declared, Mr. Fanto should have: used a "de-greasing solvent . . . to remove all of the old grease and dirt;" blown out the debris in the latch using compressed air; and, "[a]fter removing the old grease with the proper solvent, lithium, or white, grease should have been liberally applied." Id. Moreover, as implied by the Weber Report, when Mr. Fanto serviced the hood latch with the penetrating oil, Mr. Fanto actually masked the problem with the hood latch by creating a "temporary fix" and making the hood latch appear to be properly operational. Id. According to the Weber Report, when the penetrating oil "eventually dried out" it "reverted the latch back to its malfunctioning condition;" specifically, the hood latch became "gritty with the accumulation of dirt" and this "cause[d] the lever and latch to stick and bind." Id.

Finally, Pennsylvania State Police Corporal Gregory Brandt concluded that "[a] mechanical problem with [the] hood latch [on the Straws' Pontiac Vibe automobile] resulted [in] its hood opening while [the vehicle] was

traveling" on Route 28. Pennsylvania State Police General Investigation Report, 1/22/13, at 21. Corporal Brandt also "concluded with [a] high level of certainty" that, prior to the accident, the hood latch on the Pontiac Vibe had been damaged "for a substantial amount of time." Id. at 17.

Viewing the above evidence in the light most favorable to Appellants demonstrates that Tower Auto owed Mr. Straw a duty under Section 323 of the Second Restatement and that Tower Auto owed Jennifer, Rowan, and Elijah Straw duties under Section 324A of the Second Restatement. There is also a genuine issue of material fact that Tower Auto breached its duties of care to Plaintiffs. Specifically, there is a genuine issue of material fact that:

) Mr. Fanto "undert[ook], . . . for consideration, to render services to [Mr. Straw] which he should [have] recognize[d] as necessary for the protection of the other's person" (Mr. Fanto undertook, for consideration, to repair the hood latch on Mr. Straw's vehicle and then informed Mr. Straw that he had "repair[ed the] hood latch assembly;" further, Mr. Fanto should have recognized that his work and statements to Mr. Straw were necessary for the protection of Mr. Straw and Mr. Straw's passengers because he should have recognized that, if the hood latch failed while Mr. Straw was driving, the hood would open and obscure the vision of Mr. Straw, thus risking harm to Mr. Straw and Mr. Straw's passengers);

) Mr. Fanto failed to exercise reasonable care in performing his work on the vehicle (according to the Weber Report, Mr. Fanto utilized the wrong lubricant on the hood latch assembly, which, in effect, concealed the problem with the hood latch and allowed the problem to manifest when the improper lubricant dried out; Mr. Fanto also informed Mr. Straw that he had "repair[ed the] hood latch assembly;" further, the hood latch on the vehicle failed on May 1, 2012 and, prior to that time, the hood latch had been damaged "for a substantial amount of time");

) Mr. Fanto's failure to exercise reasonable care increased the risk of physical harm to Mr. Straw and Mr. Straw's passengers (the Weber Report, in effect, declared that when Mr. Fanto serviced the hood latch with penetrating oil, Mr. Fanto masked the problem with the hood latch and allowed the problem to manifest when the improper penetrating oil dried out, conceivably depriving Mr. Straw of the possibility that Jiffy Lube and NAPA Auto Parts would discover the problem); and,

) the Straws suffered harm because of Mr. Straw's reliance upon the undertaking (Mr. Fanto performed work on the hood latch and informed Mr. Straw that he had "repair[ed the] hood latch assembly;" Mr. Straw drove the vehicle in reliance upon Mr. Fanto's undertaking; the Straws were later rear-ended when they were forced to stop, in the middle of Route 28, because the

hood on their vehicle unexpectedly popped open; and, the Straws all suffered grave harm as a result of the collision).

Thus, a genuine issue of material fact exists that Tower Auto owed Plaintiffs duties under Section 323(a) and (b) and Section 324A(a) and (c) of the Second Restatement. There also exists a genuine issue of material fact that Tower Auto breached its duties of care to Plaintiffs.

### II.B.1.a.i. The Trial Court's Rationale for Finding No Duty as to Tower Auto was Mistaken

According to the trial court, Tower Auto owed Plaintiffs no duty of care because: "Tower Auto serviced the vehicle more than [seven] months prior to the accident; Plaintiffs experienced no problems with the hood for [three] months until after Jiffy Lube changed the vehicle's oil; and Plaintiffs never returned to Tower Auto after experiencing trouble with the hood latch." Trial Court Opinion, 9/8/16, at 7.

The facts cited by the trial court do not negate the existence of the duties Tower Auto owed to Plaintiffs. This is especially true in light of the Weber Report. To be sure, according to the Weber Report, Mr. Fanto incorrectly used penetrating oil to lubricate the hood latch. Weber Report, 8/11/15, at 4. According to the Weber Report, servicing the latch with penetrating oil was merely a "temporary fix." The Weber Report declared that the oil "eventually dried out" and caused the latch to "revert[] . . . back to its malfunctioning condition;" specifically, the hood latch became "gritty

with the accumulation of dirt" and this "cause[d] the lever and latch to stick and bind." Id.

Viewing the Weber Report in the light most favorable to Appellants demonstrates that Tower Auto breached the duties it owed to Plaintiffs under Sections 323 and 324A of the Second Restatement at the time it serviced the hood latch. The trial court erred in concluding otherwise.

II.B.1.a.ii. Tower Auto's Arguments to this Court are Meritless

Within Tower Auto's appellate brief, Tower Auto claims that "there is no evidence that it breached a duty to the Plaintiffs" because: 1) it is entitled to limited immunity from suit under 75 Pa.C.S.A. § 4702.1 and, 2) the Weber Report, upon which Appellants rely, "is entirely based off of a misreading of the owner's manual for the Straw vehicle" and must be disregarded. Appellant's Brief at 22-23. These claims fail.

75 Pa.C.S.A. § 4702.1, entitled "limited liability of inspection station or mechanic," declares, in relevant part:

> (a) General rule.--An inspection conducted pursuant to section 4702(a) (relating to annual inspection) . . . shall not be construed as a guaranty of the safety of any vehicle and neither the official inspection station issuing the certificate of inspection nor the official inspection mechanic performing the inspection shall be liable to the owner or occupants of any inspected vehicle for any damages caused by the failure or malfunction of that vehicle or to the owner or occupants of any vehicle involved in an accident with that inspected vehicle or to any pedestrian injured in the accident unless it can be shown by a preponderance of the evidence that the failure was caused by the negligence of the inspection station or mechanic.

75 Pa.C.S.A. § 4702.1 (emphasis added).

This Section does not entitle Tower Auto to summary judgment because, as explained above, there exists a genuine issue of material fact that "the failure [of the hood latch] was caused by the negligence of the inspection station or mechanic." Id.

Tower Auto also claims that this Court should "disregard" the Weber Report because the Weber Report "is entirely based off of a misreading of the owner's manual for the Straw vehicle." Appellant's Brief at 22-23. This argument plainly fails at the summary judgment stage, as it constitutes a simple attack upon the credibility and weight of Appellants' expert. Summers, 997 A.2d at 1161 ("[i]t has long been Pennsylvania law that, while conclusions recorded by experts may be disputed, the credibility and weight attributed to those conclusions are not proper considerations at summary judgment; rather, such determinations reside in the sole province of the trier of fact").

II.B.1.b. Jiffy Lube's Duties and Breaches of Its Duties to Plaintiffs

Viewing the record in the light most favorable to Appellants, Appellants produced the following evidence that Jiffy Lube owed duties of care to Plaintiffs and that Jiffy Lube breached those duties.

In January 2012, following an oil change at Jiffy Lube, Mr. Straw returned to the Jiffy Lube and told the employees "I got an oil change here, and the next thing I know my hood doesn't close all the way." Deposition of Thomas Straw, 5/13/15, at 33. Mr. Straw testified that a Jiffy Lube

employee "just kind of grunted and went and got some tools, you know, worked with it for a little bit, grunted some more, went and got some other tools, worked with it, got it down and that was that." Id. Mr. Straw testified that, when the employee finished, Mr. Straw asked the employee "is [this] safe to drive? It's not going to pop up on me?;" the employee responded by declaring that the vehicle was safe to drive. Id. at 34 and 71.

Nevertheless, on May 1, 2012, the hood latch failed on the Straws' vehicle, resulting in the "hood opening while [the vehicle] was traveling" on Route 28. Pennsylvania State Police General Investigation Report, 1/22/13, at 21. Further, as Corporal Brandt concluded, the hood latch on the Straws' vehicle had been damaged "for a substantial amount of time" prior to the accident. Id. at 17.

Viewing the record in the light most favorable to Appellants, Jiffy Lube owed a duty to Mr. Straw under Section 323, and to Jennifer, Rowan, and Elijah Straw under Section 324A, of the Second Restatement; there also exists a genuine issue of material fact that Jiffy Lube breached its duties of care to Plaintiffs. To be sure, the record demonstrates that:

) a Jiffy Lube employee "undert[ook], gratuitously . . . , to render services to [Mr. Straw] which he should [have] recognize[d] as necessary for the protection of [Mr. Straw's] person" (the Jiffy Lube employee undertook to repair the hood latch on the Straws' vehicle and then assured Mr. Straw that the vehicle was "safe to drive;" further, the employee should have recognized that his

work and statements to Mr. Straw were necessary for the protection of Mr. Straw and Mr. Straw's passengers because he should have recognized that, if the hood latch failed while Mr. Straw was driving, the hood would fly up and obscure the vision of Mr. Straw, thus risking harm to Mr. Straw and his passengers);

ʃ the Jiffy Lube employee failed to exercise reasonable care in performing his work on the vehicle and in advising Mr. Straw as to the car's safety (approximately three or four months after Jiffy Lube performed its work and assured Mr. Straw of the latch's safety, the hood latch on the vehicle failed and, at the time of failure, the hood latch had been damaged "for a substantial amount of time");

ʃ the Jiffy Lube employee's failure to exercise reasonable care increased the risk of physical harm to Mr. Straw and Mr. Straw's passengers (the employee's failure to perform the undertaking in a non-negligent manner and his assurances of safety to Mr. Straw caused Mr. Straw to believe the latch was safe and to, thus, not protect himself or his family against the risk of the hood opening while he was driving); and,

ʃ the Straws suffered harm because of Mr. Straw's reliance upon the undertaking (the Jiffy Lube employee purportedly repaired the hood latch and then assured Mr. Straw that the latch was

safe; Mr. Straw drove the vehicle; and, the Straws were later rear-ended when they were forced to stop, in the middle of Route 28, because the hood on their vehicle unexpectedly popped open).

The record, as stated above, reveals a genuine issue of material fact that Jiffy Lube owed Plaintiffs duties – and breached those duties – under Section 323(a) and (b) and Section 324A(a) and (c) of the Second Restatement.[13]

### II.B.1.b.i. The Trial Court's Rationale for Finding No Duty as to Jiffy Lube was Mistaken

_____

[13] Our Supreme Court has not adopted the Restatement (Third) of Torts: Liability for Physical Harm (Proposed Draft Number One), and although we do not express any opinion as to the acceptance of this provision, we note that comment f to Section 42 ("Duty Based on Undertaking") explains:

> f. Increasing the risk of harm.  The requirement that the actor increase the risk of harm means that the risk to the other person is increased beyond that which existed in the absence of the actor's undertaking.

> This requirement is often met because the plaintiff or another relied on the actor's performing the undertaking in a nonnegligent manner and declined to pursue an alternative means for protection. Although reliance is merely a specific manner of increasing the risk of harm for another, this Section retains reliance as a separate basis for imposing a duty because historically it has been treated separately.

Restatement (Third) of Torts:  Liability for Physical Harm § 42 cmt. f (PFT No. 1).

The trial court reasoned that Jiffy Lube did not owe Plaintiffs any duty because: "Jiffy Lube is in the business of changing oil not repairing hood latches; Plaintiffs experienced no problems with the hood for a week after the oil change; an employee attempted to aid Plaintiffs free of charge upon their return; the employee never told Mr. Straw he fixed anything; Plaintiffs did not experience any issues with the hood for several weeks later despite driving to Ohio multiple times." Trial Court Opinion, 9/8/16, at 8. We conclude that the trial court's reasoning is mistaken.

First, as to the fact that "Plaintiffs experienced no problems with the hood for a week after the oil change," we conclude that this fact does not bear upon the existence of Jiffy Lube's duty. This is because the employee performed the work on the hood latch, and assured Mr. Straw of the hood latch's safety, after the oil change had occurred. Deposition of Thomas Straw, 5/13/15, at 32-33 (Mr. Straw explained that he received an oil change at Jiffy Lube and then, approximately one week later, he returned to the Jiffy Lube because the hood of his car would not close all the way).

Second, the trial court held that "an employee attempted to aid [Mr. Straw] free of charge upon [his] return" negated the existence of Jiffy Lube's duty. However, this fact does not negate the existence of a duty, as Sections 323 and 324A impose a duty of reasonable care upon "[o]ne who undertakes, gratuitously or for consideration, to render services to another. . . ." Restatement (Second) of Torts §§ 323 and 324A (emphasis added).

Third, the trial court reasoned, Jiffy Lube did not have a duty to Plaintiffs because "Jiffy Lube is in the business of changing oil not repairing hood latches." Trial Court Opinion, 9/8/16, at 8. This reasoning fails because the Jiffy Lube employee actually performed work on the hood latch and, thus, "undert[ook] . . . to render services to [Mr. Straw] which he should [have] recognize[d] as necessary for the protection of [Mr. Straw's] person." Restatement (Second) of Torts §§ 323 and 324A. Further, although Jiffy Lube's business specialty might create a factual issue concerning whether Mr. Straw "relied" upon the employee's safety assurances, this factual issue cannot be resolved at the summary judgment stage. See, e.g., Leach v. Phila. Sav. Fund Soc., 340 A.2d 491, 492 (Pa. Super. 1975) ("[s]ummary judgment may be entered only in the clearest of cases where there is not the slightest doubt as to the absence of an issue of material fact. . . . The existence of [an] issue of material fact renders the summary judgment procedure premature and inappropriate"). To be sure, as explained in the comments to Section 323 of the Second Restatement:

> One who gratuitously gives transportation to another, or otherwise renders gratuitous services to him, is not subject to liability to him for his failure to have the competence or to exercise the skill normally required of persons doing such acts, if the other who accepts the services is aware, through information given by the actor or otherwise, of his incompetence. However, a contract to render services, or a gratuitous offer to render them, or even merely giving them at the other's request, may carry with it a profession or representation of some skill and competence; and if the actor realizes or should realize that his competence and skill are subnormal, he must exercise reasonable care to inform

> the other. If he does not do so, he is subject to liability for physical harm resulting from his deficiencies.

Restatement (Second) of Torts § 323 cmt. b.

In the case at bar, there is no evidence: that the Jiffy Lube employee possessed a "subnormal" skill or competence in general car repair or, specifically, in fixing hood latches; that the employee informed Mr. Straw that he possessed any such subnormal skill or competence; or, that Mr. Straw "realize[d] or should [have] realize[d] that [the employees'] competence and skill [was] subnormal." Id. Therefore, the mere fact that "Jiffy Lube is in the business of changing oil not repairing hood latches" does not entitle Jiffy Lube to summary judgment. See Trial Court Opinion, 9/8/16, at 8.

Finally, the trial court reasoned that Jiffy Lube did not have a duty to Plaintiffs because "the employee never told Mr. Straw he fixed anything" and "Plaintiffs did not experience any issues with the hood for several weeks later despite driving to Ohio multiple times." Id. These reasons do not support the trial court's grant of summary judgment.

Simply stated, the assertion that "the employee never told Mr. Straw he fixed anything" fails to view the record in the light most favorable to Appellants. Certainly, under the proper standard of review, the record reflects that the employee worked on the hood latch, was able to fully close the hood, and then assured Mr. Straw that the hood latch was safe. Deposition of Thomas Straw, 5/13/15, at 29-33. Viewing these facts in the light most favorable to Appellants demonstrates that the Jiffy Lube employee

endeavored to repair the hood latch and then, through his actions and words, represented to Mr. Straw that he had repaired the hood latch and that the latch was "safe."

Further, the fact that "Plaintiffs did not experience any issues with the hood for several weeks [] despite driving to Ohio multiple times" does not negate the existence of a duty upon Jiffy Lube because the hood latch failed three to four months after its employee worked on the latch and assured Mr. Straw that it was safe. Moreover, following the accident, Corporal Brandt concluded that the hood latch on the Straws' vehicle had been damaged "for a substantial amount of time" prior to the accident. Thus, there is evidence that, although the employee manipulated the latch, he did not repair it and unreasonably assured Mr. Straw that the latch was safe. The trial court's conclusion to the contrary was in error.

II.B.1.b.ii. Jiffy Lube's Arguments to this Court are Meritless

On appeal, Jiffy Lube primarily claims that it did not owe Plaintiffs any duty because there was "[n]o evidence that [Jiffy Lube] was in the business of fixing hoods or hood latches of cars, particularly free of charge." Jiffy Lube's Brief at 12. As explained above, this claim does not entitle Jiffy Lube to summary judgment.[14]

_____

[14] Within Jiffy Lube's appellate brief to this Court, Jiffy Lube also claims that it did not owe Plaintiffs any duty because the accident was not foreseeable. Jiffy Lube's Brief at 12. We will analyze the foreseeability of the accident below.
(Footnote Continued Next Page)

### II.B.1.c. NAPA Auto Parts' Duties and Breaches of Its Duties to Plaintiffs

Viewing the record in the light most favorable to Appellants as the non-moving parties, the evidence as to NAPA Auto Parts' liability is as follows.

In March 2012, Mr. Straw and his family drove to Ohio. During their trip, they stopped their Pontiac Vibe automobile at a NAPA Auto Parts store to purchase a tail light bulb. Deposition of Thomas Straw, 5/13/15, at 35. While there, Mr. Straw asked an employee to "take a look at [the hood] and . . . let me know if it's all right, if it's safe." Id. at 36. Mr. Straw testified: "I said I have a state inspection coming up in a couple months, is this going to make it to the state inspection, is it safe[?] He said absolutely. He said it's metal on metal. They don't call it a safety latch for nothing." Id. at 36.

Mr. Straw testified that he could not remember whether the NAPA Auto Parts' employee did "anything physically with the car," but Mr. Straw testified that he relied upon the employee's assurances that the hood was safe. Id. at 36-37.

Approximately six weeks later, the hood latch on the Straws' Pontiac Vibe failed, thus leading to the accident. Further, Corporal Brandt "concluded with [a] high level of certainty" that, prior to the accident, the hood latch on the Pontiac Vibe had been damaged "for a substantial amount

(Footnote Continued) ─────────────────

of time." Pennsylvania State Police General Investigation Report, 1/22/13, at 17.

Viewing this evidence in the light most favorable to Appellants establishes a prima facie case under Sections 323 and 324A of the Second Restatement. It demonstrates that:

) a NAPA Auto Parts employee "undert[ook], gratuitously . . . , to render services to [Mr. Straw] which he should [have] recognize[d] as necessary for the protection of [Mr. Straw's] person" (the NAPA Auto Parts employee undertook to analyze the hood latch on the Straws' vehicle and then assured Mr. Straw that the vehicle was "safe;"[15] further, the employee should have recognized that his work and statements to Mr. Straw were necessary for the protection of Mr. Straw and Mr. Straw's passengers because he should have recognized that, if the hood latch failed while Mr. Straw was driving, the hood would fly up and obscure the vision of Mr. Straw, thus risking harm to Mr. Straw and Mr. Straw's passengers);

_____

[15] See Farabaugh v. Pa. Tpk. Comm'n, 911 A.2d 1264, 1284 (Pa. 2006) ("the plain language of Section 324A merely requires an undertaking to 'render services to another,' which we find to encompass the rendering of inspection services"); Shannon v. McNulty, 718 A.2d 828 (Pa. Super. 1998) (holding that, under Section 323, the plaintiffs established that the defendant "render[ed] services" by issuing "telephonic advice").

⟩ the NAPA Auto Parts employee failed to exercise reasonable care in performing his analysis on the vehicle and in advising Mr. Straw as to the car's safety (approximately six weeks after the NAPA Auto Parts employee looked at the vehicle and assured Mr. Straw of the latch's safety, the hood latch on the vehicle failed and, at the time of failure, the hood latch had been damaged "for a substantial amount of time"); and,

⟩ the NAPA Auto Parts employee's failure to exercise reasonable care increased the risk of physical harm to Mr. Straw and Mr. Straw's passengers (the employee's assurances of safety to Mr. Straw caused Mr. Straw to believe the latch was safe and to, thus, not protect himself or his family against the risk of the hood opening while he was driving); and,

⟩ the Straws suffered harm because of Mr. Straw's reliance upon the undertaking (the NAPA Auto Parts employee undertook to assure Mr. Straw that the latch was safe; Mr. Straw relied upon the advice and drove the vehicle; and, the Straws were later rear-ended when they were forced to stop, in the middle of Route 28, because the hood on their vehicle unexpectedly popped open).

The record thus reveals a genuine issue of material fact that NAPA Auto Parts owed Plaintiffs duties under Section 323(a) and (b) and Section

324A(a) and (c) of the Second Restatement and that NAPA Auto Parts breached its duties of care to Plaintiffs.

### II.B.1.c.i. The Trial Court's Rationale for Finding No Duty as to NAPA Auto Parts was Mistaken

The trial court held that NAPA Auto Parts did not owe Plaintiffs any duty because: "NAPA [Auto Parts] is an auto parts store not a repair shop; the employee was asked to look at the hood latch and did so free of charge; [six] weeks elapsed between the NAPA [Auto Parts] visit and the accident; and between the NAPA [Auto Parts] visit and the accident, Plaintiffs drove their car to Ohio and elsewhere putting hundreds of miles on the car." Trial Court Opinion, 9/8/16, at 8.

This Court has already explained why the trial court's rationale fails. Nevertheless, we note: there is no evidence that the NAPA Auto Parts' employees' skill and competence at car maintenance was subnormal or that Mr. Straw "realize[d] or should [have] realize[d] that [the employees'] competence and skill [was] subnormal" (thus, at the summary judgment stage, it is immaterial that "NAPA [Auto Parts] is an auto parts store not a repair shop"); Sections 323 and 324A impose a duty of reasonable care upon "[o]ne who undertakes, gratuitously or for consideration, to render services to another" (thus, at the summary judgment stage, it is irrelevant that "the employee was asked to look at the hood latch and did so free of charge"); and, six weeks after the NAPA Auto Parts' employee declared the Straws' hood latch "safe," "[a] mechanical problem with [the] hood latch [on

the Straws' automobile] resulted [in] its hood opening while [the vehicle] was traveling" on Route 28 and, at the time of failure, the hood latch had been damaged "for a substantial amount of time" (therefore, summary judgment is not proper merely because "[six] weeks elapsed between the NAPA [Auto Parts] visit and the accident and . . . Plaintiffs drove their car to Ohio and elsewhere putting hundreds of miles on the car").

II.B.1.c.ii. NAPA Auto Parts' Arguments to this Court are Meritless

Within its brief, NAPA Auto Parts claims that it had no duty to Plaintiffs and, in support, repeats many of the same arguments that the trial court made. NAPA Auto Parts' Brief at 15-18. For the reasons set forth above, we reject those arguments.

NAPA Auto Parts also claims that its employee "could not possibly have foreseen that his actions were necessary for the protection of Plaintiff[s]" and that NAPA Auto Parts, thus, does not have any duty to Plaintiffs under Sections 323 and 324A of the Second Restatement. Id. at 17. This claim fails because, viewing the evidence in the light most favorable to Appellants, the employee undertook to analyze the Straws' vehicle and undertook to give Mr. Straw advice that the hood latch on the vehicle was "safe." Deposition of Thomas Straw, 5/13/15, at 36. If the employee failed to exercise reasonable care in this undertaking and improperly assured Mr. Straw that the hood latch was safe, a direct and easily foreseeable result of this improper advice would be that the hood would fly open while the vehicle was in operation, thus endangering Mr. Straw and his passengers.

Therefore, in this case, there exists a genuine issue of material fact that the employee "should [have] recognized [that his services were] necessary for the protection of" Mr. Straw and Mr. Straw's passengers. Restatement (Second) of Torts §§ 323 and 324A. NAPA Auto Parts' claim to the contrary fails.

### II.B.1.d. Conclusion as to Duties and Breaches of Duties

We have thus concluded that there are genuine issues of material fact that Additional Defendants owed Plaintiffs duties under Sections 323 and 324A of the Second Restatement and that Additional Defendants breached those duties. We will next address our conclusion that the trial court erred in holding that "the conduct of [Appellants] was not reasonably foreseeable . . . [and, therefore,] proximate cause could not be established against the Additional Defendants." Trial Court Opinion, 9/8/16, at 7-9.

### II.B.2. Causation

### II.B.2.a. Additional Defendants' Negligence and Factual Cause Analysis

To establish a prima facie case of negligence, a plaintiff must produce sufficient facts to show that the defendant's negligence was both the cause-in-fact and the legal, or proximate, cause of her injuries. In Pennsylvania, a negligent act is a cause-in-fact of the plaintiff's injuries "if the harmful result would not have come about but for the negligent conduct." First v. Zem Zem Temple, 686 A.2d 18, 21 n.2 (Pa. Super. 1996) (internal quotations and citations omitted).

In this case, Appellants put forth sufficient evidence to create a jury question that, but for Additional Defendants' alleged negligence, Plaintiffs would not have suffered harm.   Evidence exists that, if the Additional Defendants had not been negligent, Plaintiffs would not have driven the car, the hood on Plaintiffs' car would never have opened, Plaintiffs would never have stopped their vehicle on the highway, and Mr. Fair would never have crashed into Plaintiffs' vehicle.   Hence, in this case, there is a genuine issue of material fact that Additional Defendants' negligence was a factual cause of Plaintiffs' harm.[16]

II.B.2.b. Proximate Causation and Intervening Causes

Regarding proximate cause, conduct is a proximate cause of the plaintiff's harm where the conduct "was a substantial factor in bringing about the harm inflicted upon a plaintiff."   Jones v. Montefiore Hosp., 431 A.2d 920, 923 (Pa. 1981).   As the Pennsylvania Supreme Court explained:

> At its root, the concept of legal cause . . . is an articulation of policy related to social and economic considerations. Dean Prosser has described proximate or legal causation as follows:
>
> > Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally responsible for what he has caused. Unlike the fact of causation, with which it is often

_____

[16] Further, on appeal, the Additional Defendants do not claim that factual causation is lacking.

> hopelessly confused, this is essentially a problem of law. It is sometimes said to be a question of whether the conduct has been so significant and important a cause that the defendant should be legally responsible. But both significance and importance turn upon conclusions in terms of legal policy, so that this becomes essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred.

Prosser, Law of Torts § 42 (4th ed.). . . . [The Pennsylvania Supreme] Court, in accord with Prosser, has stated: "the concept [of proximate cause], like that of negligence itself, was designed not only to permit recovery for a wrong but to place such limits upon liability as are deemed socially or economically desirable from time to time." Grainy v. Campbell, 425 A.2d 379, 382 (Pa. 1981). . . .

As a general rule, however, in the absence of policy considerations which would limit liability, if an actor's negligence is the legal cause of damages sustained by another, the actor is liable for those damages. Under the analysis of "legal cause" set forth in the Restatement of Torts, Second and adopted by [the Pennsylvania Supreme] Court . . . , the question is whether the defendant's conduct was a "substantial factor" in producing the injury. Restatement (Second) of Torts § 431.

As [the Pennsylvania Supreme] Court observed in Ford v. Jeffries, [379 A.2d 111 (Pa. 1977),] ordinarily the determination of whether the defendant's conduct was a substantial cause of the injuries complained of should not be taken from the jury if the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm. See also Restatement (Second) of Torts § 434. If issues are raised on which a jury may not reasonably differ, it is proper for the trial court to decide them. If, on the other hand, a jury may reasonably differ on whether the defendant's conduct was a substantial factor in causing the injury, generally, the case must go to the jury on those issues.

Vattimo v. Lower Bucks Hosp., Inc., 465 A.2d 1231, 1233-1234 (Pa. 1983) (plurality) (emphasis omitted) (some internal citations omitted).

Section 433 of the Second Restatement of Torts sets forth three "considerations [that are] important in determining whether negligent conduct is [a] substantial factor in producing harm." Restatement (Second) of Torts § 433. The section declares:

> The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
>
> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.

Restatement (Second) of Torts § 433; see also Betz v. Pneumo Abex, LLC, 44 A.3d 27, 56 n.36 (Pa. 2012) ("th[e Pennsylvania Supreme] Court has cited [Restatement (Second) of Torts §] 433 as consistent with Pennsylvania law").

"Two or more causes may contribute to and thus be the legal or proximate cause of an injury." Feeny v. Disston Manor Personal Care Home, Inc., 849 A.2d 590, 595 (Pa. Super. 2004). Further, and relatedly, where an act or force "actively operates in producing harm to [the plaintiff]

after [the defendant's] negligent act [] has been committed," that intervening force does not necessarily relieve the defendant of liability. Restatement (Second) of Torts § 441. Instead, for an act to break the causal chain and relieve the defendant of liability, the act must be "so extraordinary as not to have been reasonably foreseeable." Von der Heide v. Commonwealth, Dep't of Transp., 718 A.2d 286, (Pa. 1998); Trude v. Martin, 660 A.2d 626, 632 (Pa. Super. 1995). In such a case, the act constitutes a "superseding cause" and, "by its intervention, [the act] prevents the [defendant] from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Von der Heide, 718 A.2d at 288 (quoting Restatement (Second) of Torts § 440). "A determination of whether an act is so extraordinary as to constitute a superseding cause is normally one to be made by the jury." Powell v. Drumheller, 653 A.2d 619, 624 (Pa. 1995).

The Restatement lists a number of considerations that "are of importance in determining whether an intervening force is a superseding cause of harm to another." Restatement (Second) of Torts § 442. The listed considerations are:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

Id.

The Restatement also declares:

Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

Restatement (Second) of Torts § 442B; see also Ford, 379 A.2d at 115

(quoting comment b to Section 442B). And:

If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.

Restatement (Second) of Torts § 449.

In the case at bar, the trial court essentially held that Mr. Fair's reckless[17] actions on May 1, 2012 constituted a superseding cause of Plaintiffs' harm as a matter of law – and that, as a result of Mr. Fair's criminal actions, the Additional Defendants were relieved of liability for their alleged negligence. Respectfully, we conclude that this holding is incorrect.

II.B.2.b.i. Appellants' Conduct and Intervening Cause Analysis

As summarized above, Appellants put forth evidence that the Additional Defendants negligently: performed work on the hood latch of the Straws' vehicle and/or analyzed the vehicle and assured the Straws that the hood latch was safe. Viewing the evidence in the light most favorable to

_____

[17] As was previously noted, Mr. Fair pleaded guilty to four counts of REAP. 18 Pa.C.S.A. § 2705 defines REAP in the following manner:

> A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S.A. § 2705.

REAP is a non-summary criminal offense and, as is evident in the crime's definition, a necessary element of REAP is the mens rea of "recklessness." Therefore, at least with respect to Mr. Fair and the vicarious liability of Golon Masonry, Mr. Fair's guilty plea to REAP constitutes "conclusive evidence," in this civil proceeding, that Mr. Fair acted recklessly on May 1, 2012. See Folino v. Young, 568 A.2d 171, 172-173 (Pa. 1990) ("operative facts necessary for non-summary criminal convictions [may] be admitted as conclusive facts in civil suits arising from the same event"); Hurtt v. Stirone, 206 A.2d 624, 625-627 (Pa. 1965) (holding that the civil defendant's prior conviction for extortion constituted "conclusive evidence of the fact of the alleged extortion" in the later, civil trial).

Appellants, at the time each Additional Defendant performed its services for the Straws, the Additional Defendant knew or should have known that a foreseeable consequence of any negligence with respect to the hood latch would be that: the Straws would drive their vehicle; the air speed at the front of the Straws' vehicle would increase as the Straws increased the speed of their vehicle; the increasing air speed at the front of the vehicle would increase the drag upon a partially raised, unsecured hood; and, as a result of the increased drag upon the hood, the unsecured hood on the vehicle would fly open while the Straws were driving. Further, the Additional Defendants should have known that a foreseeable risk of their negligence would be that the suddenly-raised hood would obscure Mr. Straw's vision of the road, leading to the foreseeable risk that Mr. Straw would hit an object in front of him, lose control of his vehicle, or unexpectedly stop his vehicle on the roadway and be hit, from behind, by another vehicle – all of which could foreseeably cause grave injuries or death to Mr. Straw and his passengers. To be sure, these are the precise risks that made the Additional Defendants' actions negligent in the first place.

Moreover, Appellants put forth evidence that, as a result of Additional Defendants' negligence, Mr. Straw was driving the vehicle and the hood on the Straws' vehicle popped open while Mr. Straw was driving on a highway. This led to Mr. Straw unexpectedly stopping his vehicle on the highway, which led to Mr. Fair striking the Straws' stationary vehicle from behind, which led to the death of Elijah Straw and injuries to Thomas, Jennifer, and

Rowan Straw. In other words, Appellants have put forth evidence that Additional Defendants' conduct created the foreseeable risk of serious injury or death to Mr. Straw and his passengers, because Mr. Straw would be forced to unexpectedly stop his vehicle on the highway and be hit from behind by another vehicle – and Plaintiffs were, in fact, harmed when Mr. Straw was forced to unexpectedly stop his vehicle on the highway and was hit from behind by Mr. Fair's vehicle. As such, there is sufficient evidence to demonstrate that Plaintiffs' harm was within the scope of the original risk that Additional Defendants' negligence created.

Undoubtedly, Mr. Fair's conduct was criminal. However, Plaintiffs never claimed that Mr. Fair intentionally struck their vehicle and Mr. Fair's pleas of guilt only establish that he acted recklessly. Moreover, as our Supreme Court has held, "criminal conduct does not act as a per se superseding force." Powell, 653 A.2d at 624. Instead, the Supreme Court held, the focus in every case is not upon the criminal nature of the act, but upon "whether the act was so extraordinary as not to be reasonably foreseeable" – and that question "is normally one to be made by the jury." Id. at 624-625 (holding: "[i]t is for the jury . . . to determine whether [one defendant's] actions in attempting to pass a car while under the influence of alcohol thus crossing into [the plaintiff's] lane were so extraordinary as to be unforeseeable to [defendant] PENNDOT when designing the highway"); Crowell v. City of Phila., 613 A.2d 1178, 1185 n.12 (Pa. 1992) (holding that a defendant's drunk driving conviction did not constitute a superseding

cause and relieve the City of Philadelphia of liability for placing a dangerous street sign because, among other reasons, the defendant's criminal act of drunk driving was foreseeable); Jones v. Chieffo, 700 A.2d 417 (Pa. 1997) (plurality) (plaintiffs were struck by a car that was being pursued by the Philadelphia police and the plaintiffs sued the City of Philadelphia; the Supreme Court held that a jury must decide whether the criminal act of the driver constituted a superseding cause, which would relieve the city of liability).

Finally, we note that ordinary human experience tells us that drivers may commonly violate the posted speed limits, that they may occasionally be inattentive to the road, that they may occasionally drive dangerously, and that it may not be "extraordinary" for them to be intoxicated. See also Powell, 653 A.2d at 624-625 (holding: "[i]t is for the jury . . . to determine whether [one defendant's] actions in attempting to pass a car while under the influence of alcohol thus crossing into [the plaintiff's] lane were so extraordinary as to be unforeseeable to [defendant] PENNDOT when designing the highway"). Stated another way, ordinary human experience tells us that drivers sometimes act criminally on the roads. Therefore, in accordance with our Supreme Court's precedent, we conclude that a jury must determine whether Mr. Fair's criminal acts and particular combination of speeding, inattentive driving, and (alleged) intoxication were "so extraordinary as not to be reasonably foreseeable" to the Additional Defendants and, relatedly, whether the case falls within Sections 442B or

449 of the Second Restatement of Torts. Powell, 653 A.2d at 624; Restatement (Second) of Torts §§ 442B and 449; c.f. Ford, 379 A.2d at 115 (holding: "[i]f one engages in negligent conduct toward another, such as unreasonably increasing the risk that that person will suffer a particular kind of harm, it cannot be said, as a matter of law, that the actor is not liable simply because the foreseeable plaintiff suffered the foreseeable harm in a manner which was not foreseeable. Appellee's conduct in this case could have increased the risk that appellant's house would be damaged by fire. Such harm in fact occurred. Given these circumstances, it was for the jury to determine whether the appellee's conduct, if it was negligent, was superseded by the intervening force"). The trial court erred in holding otherwise.[18]

_____

[18] Within their briefs to this Court, Tower Auto and NAPA Auto Parts rely upon our Supreme Court's opinion in Ashworth v. Hannum, 32 A.2d 407 (Pa. 1943), to support their claims that Appellants' conduct was a superseding cause of Plaintiffs' harm. However, Ashworth was based upon a case and a legal doctrine that the Pennsylvania Supreme Court later explicitly overruled. To be sure, Ashworth was based upon the Pennsylvania Supreme Court's earlier opinion in Kline v. Moyer, 191 A. 43 (Pa. 1937) and upon the doctrine that, "[i]f the defendant has created only a passive, static condition which made the damage possible, the defendant is said not to be liable." W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 42 (5th ed. 1984); Ashworth, 32 A.2d at 409 ("As we said in Kline v. Moyer[]: 'Where a second actor has become aware of the existence of a potential danger created by the negligence of an original tort-feasor, and thereafter, by an independent act or negligence, brings about an accident, the first tort-feasor is relieved of liability, because the condition created by him was merely a circumstance of the accident and not its proximate cause.' Thus, [the first actor's] negligence in parking the truck as he did was superseded by appellant's negligent and unforeseeable

(Footnote Continued Next Page)

### II.B.2.b.ii. Additional Defendants' Negligence and Proximate Cause Analysis

Further, and for many of the same reasons set forth above, we conclude that a jury must determine whether Additional Defendants' negligence was a substantial factor in causing Plaintiffs' harm. Rabutino v. Freedom St. Realty Co., 809 A.2d 933, 941 (Pa. Super. 2002) ("[w]hether a defendant's conduct has been a 'substantial factor' in causing plaintiff's harm is ordinarily a question of fact for the jury").

First, as explained above, there is sufficient evidence to demonstrate that Plaintiffs' harm was within the scope of the original risk that Additional Defendants' negligence created and that Plaintiffs' harm was the natural and foreseeable result of Additional Defendants' separate negligence.

Second, with respect to Additional Defendants, the evidence at the summary judgment stage demonstrates that they each increased the risk of physical harm to Mr. Straw and his passengers. See Restatement (Second) of Torts §§ 323(a) and 324A(a); see also supra at **32-50.

As our Supreme Court has held:

(Footnote Continued) ———————————————

conduct and made a remote cause of the accident"). Our Supreme Court later adopted Section 447 of the Second Restatement of Torts (and Section 447's focus upon "foreseeability") to deal with the issue of superseding cause and, therefore, held: "to the extent that Kline and any cases following Kline are in conflict with § 447 they are expressly overruled." Grainy v. Campbell, 425 A.2d 379, 382 (Pa. 1981). Ashworth followed Kline and Ashworth is in direct conflict with Section 447 of the Second Restatement. Therefore, Ashworth is not good law and neither Tower Auto nor NAPA Auto Parts should have relied upon the case.

> [O]nce a plaintiff has demonstrated that defendant's acts or omissions, in a situation to which Section 323(a) applies, have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate case will have been made out if the jury sees fit to find cause in fact.

Jones v. Montefiore Hosp., 431 A.2d 920, 924 (Pa. 1981) (internal quotations and citations omitted); Wilson v. U.S. Sec. Assoc's, Inc., ___ A.3d ___, 2017 WL 3034031 (Pa. Super. 2017) ("[t]he jury could have properly concluded that th[e] failure to communicate an emergency threatening situation was a substantial factor in increasing the risk of harm, setting in operation the sequence of events by which [the shooter] could proceed unimpeded to the break room, where she shot her victims").

Thus, the evidence, viewed in the light most favorable to Appellants, demonstrates that Additional Defendants increased the risk of physical harm to Mr. Straw and his passengers; as such, Appellants established a jury question that Additional Defendants' negligence was a substantial factor in causing Plaintiffs' injuries. Jones, 431 A.2d at 924.

Finally, even though Tower Auto, Jiffy Lube, and NAPA Auto Parts performed their services weeks or months prior to the accident, the mere lapse of time does not take the proximate cause issue away from the jury. Viewing the evidence in the light most favorable to Appellants, a jury could properly conclude that the hood latch had been damaged "for a substantial amount of time" prior to the accident and that it merely took weeks or

months for the air speed and drag to finally, and foreseeably, open the dangerously unsecured hood. See, e.g., W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 43 (5th ed. 1984) ("[r]emoteness in time or space may give rise to the likelihood that other intervening causes have taken over the responsibility. But when causation is found, and other factors are eliminated, it is not easy to discover any merit whatever in the contention that such physical remoteness should of itself bar recovery. The defendant who sets a bomb which explodes ten years later, or mails a box of poisoned chocolates from California to Delaware, has caused the result, and should obviously bear the consequences").

Hence, in the case at bar it is for a jury to determine whether Additional Defendants' negligence was a substantial factor in causing Plaintiffs' harm.

We have thus determined that the trial court erred in granting Additional Defendants' motions for summary judgment. We next explain why the trial court erred in dismissing Appellants' cross-claim against Thomas Straw.

### II.C. The Trial Court Erred in Dismissing Appellants' Cross-Claim Against Thomas Straw

As explained above, Appellants filed a cross-claim against Mr. Straw and alleged that Mr. Straw was directly liable to Jennifer Straw, Rowan Straw, and the Estate of Elijah Straw, or liable over to Appellants for contribution or indemnity. According to Appellants, Mr. Straw was negligent

for, among other things, driving his vehicle even though he knew that "the hood and/or latching mechanism on the vehicle was not in good operating condition" and for "allow[ing the vehicle] to remain in the lane of travel when it was unsafe and hazardous to do so." Appellants' Cross-Claim, 5/22/13, at ¶ 2. The trial court granted Mr. Straw's motion for summary judgment and dismissed the cross-claim against him because, it held: 1) Mr. Straw's conduct was not a proximate cause of the harm, and 2) Mr. Straw's alleged "contributory negligence cannot be weighed or applied to [Mr. Fair's] reckless conduct." Trial Court Opinion, 9/8/16, at 4-5.

Appellants claim that the trial court erred in dismissing their cross-claim against Mr. Straw. We agree.

II.C.1. Mr. Straw's Conduct and Negligence Analysis

At the outset, the trial court erred in concluding that summary judgment was proper because "Mr. Straw's conduct could not be found to be the proximate cause of [the] harm." Trial Court Opinion, 9/8/16, at 5 n.3.

Given our earlier discussion in this opinion, we need not speak long on the current issue. However, we note that, when the evidence is viewed in the light most favorable to Appellants, there is a genuine issue of material fact that Mr. Straw knew there was a problem with his hood latch and, nevertheless, drove his wife and children on the day in question. See, e.g., Pennsylvania State Police General Investigation Report, 1/22/13, at 21 ("in a post-crash interview with investigators, [Thomas Straw] related that he was aware of the faulty hood latch and attempted to have the latch repaired one

or two weeks prior"); Weber Report, 8/11/15, at 1 ("Mr. and Mrs. Straw knowingly operated the Pontiac with the hood not completely latched. The Pontiac should not have been driven at higher speeds until the hood was properly repaired and latched.") (internal paragraphing omitted). Therefore, there is evidence that Mr. Straw violated his duty to his passengers by acting unreasonably in light of the recognizable risk.

Further, as explained above, it is for a jury to determine whether Mr. Straw's alleged breach of his duty to his occupants was the proximate cause of the accident and whether Mr. Fair's conduct constituted a superseding cause of the harm. The trial court's contrary holding was in error.

## II.C.2. Apportionment of Liability and Contribution Between Reckless and Negligent Co-Defendants

The trial court also granted Mr. Straw's summary judgment motion because, it held, Mr. Straw's alleged "contributory negligence cannot be weighed or applied to [Mr. Fair's] reckless conduct." Trial Court Opinion, 9/8/16, at 4-5. With respect, we conclude that this holding was in error.

Initially, the trial court mistakenly confused Appellants' cross-claim against Mr. Straw with Appellants' affirmative defense that Mr. Straw was comparatively negligent for his own injuries. True, under the plain terms of the Comparative Negligence Act, a defendant's reckless conduct cannot be compared to the plaintiff's negligence. See Johnson v. City of Phila., 808 A.2d 978, 983 (Pa. Cmwlth. 2002) ("[u]nder the Comparative Negligence Act, the only conduct that is statutorily authorized to be compared is

negligent conduct") (emphasis in original). To be sure, Section 7102(a) of the Comparative Negligence Act declares:

> (a) General rule.--In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

42 Pa.C.S.A. § 7102(a) (emphasis added); see also McMeekin v. Harry M. Stevens, Inc., 530 A.2d 462, 464 (Pa. Super. 1987) (noting that Section 7102(a) only applies to "actions brought to recover damages for negligence").

However, with respect to Appellants' cross-claim against Mr. Straw, Appellants did not claim that Mr. Straw's negligence should bar or diminish Mr. Straw's own recovery. Rather, they claimed that Mr. Straw's negligence rendered him directly liable to Jennifer Straw, Rowan Straw, and the Estate of Elijah Straw, or liable over to Appellants for contribution or indemnity. Under this theory, Mr. Straw was simply another defendant in the action and, thus, the plain terms of Section 7102(a) have no application to Appellants' cross-claim against Mr. Straw. See Pa.R.C.P. 1031.1 ("Any party may set forth in the answer or reply under the heading "Cross-claim" a cause of action against any other party to the action that the other party may be (1) solely liable on the underlying cause of action or (2) liable to or

with the cross-claimant on any cause of action arising out of the transaction or occurrence or series of transactions or occurrences upon which the underlying cause of action is based"); Pa.R.C.P. 1031.1 cmt. ("[t]he claims which may be asserted in a cross-claim are identical to those which serve as bases for joining an additional defendant"); BLACK'S LAW DICTIONARY 404 (8th ed. 2004) (defining a "cross-claim" as "[a] claim asserted between codefendants or coplaintiffs in a case").

Moreover, nothing in Section 7102(a.1) or in the Uniform Contribution Among Tortfeasors Act (UCATA) would prohibit apportionment of liability or contribution between reckless and negligent co-defendants. Section 7102(a.1) declares:

> (a.1) Recovery against joint defendant; contribution.—
>
> (1) Where recovery is allowed against more than one person, including actions for strict liability, and where liability is attributed to more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of that defendant's liability to the amount of liability attributed to all defendants and other persons to whom liability is apportioned under subsection (a.2).
>
> (2) Except as set forth in paragraph (3), a defendant's liability shall be several and not joint, and the court shall enter a separate and several judgment in favor of the plaintiff and against each defendant for the apportioned amount of that defendant's liability.
>
> (3) A defendant's liability in any of the following actions shall be joint and several, and the court shall enter a joint and several judgment in favor of the plaintiff and against

the defendant for the total dollar amount awarded as damages:

. . .

(ii) An intentional tort.

(iii) Where the defendant has been held liable for not less than 60% of the total liability apportioned to all parties.

. . .

(4) Where a defendant has been held jointly and severally liable under this subsection and discharges by payment more than that defendant's proportionate share of the total liability, that defendant is entitled to recover contribution from defendants who have paid less than their proportionate share. . . .

42 Pa.C.S.A. § 7102(a.1).[19]

Thus, unlike Section 7102(a), Section 7102(a.1) does not only apply to claims sounding in negligence. To the contrary, Section 7102(a.1) expressly permits apportionment and contribution between co-defendants in strict liability actions. 42 Pa.C.S.A. § 7102(a.1)(1). Further, Section 7102(a.1) specifically declares that apportionment (and, potentially, contribution) exists between co-defendants "[w]here recovery is allowed against more than one person" and "where liability is attributed to more than one defendant." These broad terms do not limit themselves to "negligent"

_____

[19] 42 Pa.C.S.A. § 7102(a.1) became effective on June 28, 2011. Since the accident in this case occurred on May 1, 2012, Section 7102(a.1) applies to this case.

conduct – rather, the terms necessarily include "liability" for reckless and negligent conduct.[20]

Likewise, the UCATA (42 Pa.C.S.A. § 8321 et seq.) "is not geared only toward negligence situations." McMeekin, 530 A.2d at 465 (Pa. Super. 1987). Rather, as this Court explained:

> [Under the UCATA, "joint tortfeasors"] are defined as 'two or more persons jointly or severally liable in tort for the same injury to persons or property.' . . . The statutory language does not limit the right of contribution to tortfeasors who have been guilty of negligence. Contribution is available whenever two [or] more persons are jointly or severally liable in tort, irrespective of the theory by which tort liability is imposed.
>
> . . .
>
> The Uniform Contribution Among Tort-feasors Act in Pennsylvania provides that a joint tortfeasor who has discharged more than his pro rata share of a common liability may seek contribution from any other tortfeasor who contributed to the loss. The doctrine of contribution is based on equity. Therefore, the Act must be examined with equity in mind.
>
> The focus of the Uniform Act is on the relationship existing between tortfeasors rather than the manner in which several tortfeasors have been held liable to an injured claimant. . . . Thus, a tortfeasor's right to receive contribution from a joint tortfeasor derives not from his liability to the claimant but rather from the equitable principle that once the joint liability of several tortfeasors

_____

[20] Again, Plaintiffs have never claimed that Mr. Fair acted intentionally in causing the accident. Therefore, the case at bar does not concern any potential apportionment or contribution between an intentional and a negligent tortfeasor.

> has been determined, it would be unfair to impose the financial burden of the plaintiff's loss on one tortfeasor to the exclusion of the other. It matters not on which theory a tortfeasor has been held responsible for the tort committed against the plaintiff. So long as the party seeking contribution has paid in excess of his or her share of liability, it would be inequitable under the Act to deny that party's right to contribution from a second tortfeasor who also contributed to the plaintiff's injury.

McMeekin, 530 A.2d at 465 (quoting Svetz v. Land Tool Co., 513 A.2d 403 (Pa. Super. 1986)) (some internal quotations, citations, and corrections omitted); see also Commonwealth, Dep't of Transp. v. Popovich, 542 A.2d 1056, (Pa. Cmwlth. 1988), affirmed, 564 A.2d 159 (Pa. 1989) (holding that a "reckless" co-defendant may seek contribution from a "negligent" co-defendant).

We conclude that the plain language of 42 Pa.C.S.A. § 7102(a.1) and the UCATA permits apportionment and contribution between reckless and negligent co-defendants. Therefore, since Appellants' cross-claim against Mr. Straw rendered Mr. Straw a cross-claim defendant in the action – and, since Mr. Fair's recklessness does not preclude apportionment (or, potentially, contribution) between him and his (allegedly) negligent co-defendants,[21] including Mr. Straw – the trial court erred in dismissing Appellants' cross-claim against Mr. Straw.[22]

_____

[21] Within its brief to this Court, Jiffy Lube contends that it was entitled to summary judgment because it cannot be considered a joint tortfeasor with Appellants. This argument fails because there is a genuine issue of material fact that Plaintiffs suffered indivisible injuries as a result of Jiffy Lube's negligence and Mr. Fair's conduct. Carrozza v. Greenbaum, 916 A.2d 553, 

(Footnote Continued Next Page)

Judgment vacated. Case remanded. Jurisdiction relinquished.

Judge Strassburger files a Concurring and Dissenting Opinion.

Judge Stabile files a Dissenting Opinion.

---

(Footnote Continued) ———————————

556 (Pa. 2007) ("[a]lthough joint and several liability requires an indivisible injury for which two or more parties are partially responsible, it is the indivisibility of the injury, rather than of culpability, that triggers joint liability"). Therefore, at the summary judgment stage, it is too early to say whether Jiffy Lube's liability is joint and several or several only. 42 Pa.C.S.A. § 7102(a.1) ("A defendant's liability in any of the following actions shall be joint and several . . . (iii) Where the defendant has been held liable for not less than 60% of the total liability apportioned to all parties"). Further, even if it becomes true that Jiffy Lube and Appellants are not jointly liable, this fact alone would not entitle Jiffy Lube to relief. See 42 Pa.C.S.A. § 7102(a.1) (regarding apportionment of liability).

[22] Given our disposition, Appellants' claims that the "the trial court err[ed] in refusing to award a new trial based on numerous improper and prejudicial rulings at trial" are moot. See Appellant Kirk Fair's Brief at 5; Appellant Golon Masonry's Brief at 5-6 (some internal capitalization omitted); Banohashim v. R.S. Enter's., LLC, 77 A.3d 14, 27 n.6 (Pa. Super. 2013) ("[t]he grant of a new trial wipes the slate clean of the former trial"), quoting Commonwealth v. Oakes, 392 A.2d 1324, 1326 (Pa. 1978). Further, reaching the other issues on appeal would be inappropriate in this case, as we have vacated the grant of summary judgment to the Additional Defendants and Mr. Straw; the Additional Defendants and Mr. Straw are entitled to weigh in on the issues before the trial court, if the issues arise again.

J-A07012-17
J-A07013-17

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  4/30/2018